THE NO. 32. THE OVERBROOK. THE CHARLES McWILLIAMS.

(District Court, S. D. New York. March 2, 1906.)

COLLISION—TOW AND DISTRIBUTING TUG—IMPROPER FORCE USED BY TUG LEAVING SLIP.

The injury of a canal boat forming one of a tow of 21 boats lying at a pier and swinging to some extent across the adjoining slip, by collision with a tug which was lying motionless alongside, *held*, under the evidence, to have been due to the fault of another tug, which, in coming out of the slip with three boats in tow on her sides, forced the other tow outward with more violence than necessary, causing the collision.

In Admiralty. Suit for collision.

Hyland & Zabriskie, for libelant.

Robinson, Biddle & Ward and William S. Montgomery, for No. 32 and the Overbrook.

Carpenter, Park & Symmers, for the Charles McWilliams.

ADAMS, District Judge. This action was brought by William T. Jamison, the owner of the canal boat Katie E. Jamison, against the tugs No. 32 and the Overbrook to recover for the damages sustained by that boat through a collision with the stern of the Overbrook, while the tow was lying, awaiting distribution, at Pier B, Sussex Street, otherwise known as the "Red Star Dock," in Jersey City, about 4 o'clock p. m. of May 2, 1905. The port quarter of the Overbrook came into contact with the starboard side of the Jamison, which was the starboard boat of the 5th tier, about amidships. Two of her planks were broken on the upper part of her starboard side,

145 F.—47

the upper one being of oak, 5 inches thick and the other of similar size but of white pine. The top streak, second streak, shear plank and the rail were broken. The Pennsylvania Railroad Company, the claimant of the tugs already mentioned, brought in the tug Charles McWilliams by petition, alleging that she was responsible for the damages, because she pushed the Jamison forcibly against the Overbrook, as the latter was lying motionless by the tow, partly alongside of the boat on the starboard side of the 4th tier and partly alongside of the Jamison. This was denied by the claimants of the McWilliams, who alleged that in going out of the slip, with 3 boats in tow alongside, in a customary manner, she pushed the tail of the tow gently outwards, so that no damage whatever was done by her to the Jamison. The libel alleges that whilst the No. 32 was in the act of pulling the tail of the tow up the river to permit the McWilliams to get out of the slip, the Overbrook backed down and brought her stern in contact with the Jamison and that the damage was caused both by the pulling of No. 32 and the backing of the Overbrook. It is not disputed that the McWilliams was justified in pushing the tail of the tow around if she did it gently and cautiously and the question to be determined is, whether she pushed the Jamison too hard against a motionless vessel or whether the damage was caused as alleged in the libel.

It appears that the two wharves in question, i. e., the Sussex Street wharf and the Morris Street wharf, were some 350 feet apart but the former extended out into the river about 200 feet further than the latter, so that it was practically 400 feet in a direct line from the end of Sussex Street wharf to the end of Morris Street wharf.

The tow originally consisted of 6 tiers of boats, there being 5 tiers of 4 boats each, and a single boat, the Senator Rice, in the last tier. These boats were each about 100 feet long, and as they were fastened together with but few feet between the tiers, the tow was about 620 feet long. It stretched from the outer part of the lower side of Sussex Street wharf to the end of Morris Street wharf, the Rice extending about a half or two-thirds of her length along the face of the latter, but without being fastened thereto.

The tide was the last of the ebb. The wind was from the southeast, with a velocity of about 14 miles. The effect of the wind was to force the tow to the westward, so that it had a kink in it, or formed a half circle, towards the shore. Some of the boats had been removed from the tow preparatory to distribution, and it is probable that the tow had more flexibility at the time of the accident than when first fastened to the pier. This was particularly so towards the end, where the Rice had extended slightly, about a foot, the length of line fastening her to the boat ahead. In any event, it seems to be well established that a tow of the length described was in the position indicated, which necessarily involved something of a bend. The space between the piers was free. A pier called "The James Reilly Co.'s Pier," has been built there since the accident.

The McWilliams went into the slip while the tow covered the end, finding some space between the Rice and the end of Morris Street

pier. She then took the three boats in tow, 2 on her port and 1 on her starboard side, and pushed the tail of the tow in question out in the river so that she got out with her tow, while No. 32 was lying attached to the Rice. The Overbrook in the meantime had also changed a boat from the tail end of the tow to the 2nd tier and then made fast by a single line to the starboard side of the tow, making the line fast to the outside boat in the 3rd tier, and being 110 feet long, she covered the boat in the 4th tier and her stern lapped a little on the Jamison in the 5th tier.

The testimony on the part of the Railroad Company is that the Overbrook then remained still for several minutes, during which time the McWilliams pushed the tow around, causing the damage.

There is no substantial testimony to contradict that of the Railroad Company. The libelant, on the Jamison, was very indefinite in his statements regarding the Overbrook. He said he saw her move out in the river and then the collision occurred. He assumed that the Overbrook backed into his boat. The testimony on the part of the McWilliams is not much, if at all, stronger. Her witnesses said that their attention was not called to the fact of there having been damage done to the Jamison until a month or more after the occurrence and they really knew nothing about it but said they had a clear recollection of going out slowly and cautiously.

After as careful a study of the testimony as possible, I conclude that neither No. 32 nor the Overbrook was in fault. The principal allegation against the former is that in pulling the tow out, she caused the collision. In fact, she did no pulling until after the Rice was cast loose and was practically motionless when the collision occurred, as far as her own engines were concerned. The chief charge against the Overbrook is that she caused the collision by backing into the side of the Jamison. This is denied by several witnesses from the tug and I see no reason for disbelieving them.

In the absence of fault on the part of the Pennsylvania tugs, it necessarily results that the McWilliams was to blame. The testimony of the No 32's crew is that the McWilliams was pushing the tow under a jingle bell order, notwithstanding a caution from them to the pilot that he was proceeding too fast. It is urged by the McWilliams that the damage could not have occurred as the Pennsylvania Company's witnesses say it did, but such argument is not very persuasive in the face of positive testimony that it so happened and there is nothing, so far as I can see, intrinsically improbable in the situation by reason of the positions of the boats. On the contrary, it seems obvious that when the boats were cramped up with considerable force, the fantail or stern part of the Overbrook would necessarily injure the side of a boat of the character of the Jamison when brought forcibly in contact with it.

The libel against the No. 32 and Overbrook is dismissed. There will be a decree against the McWilliams, with an order of reference.